# IN THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: ) | |
| ) | CASE NO. 312-00612 |
| JOHN VINCE TROTTER, ) | |
| ) | JUDGE MARIAN F. HARRISON |
| Debtor. ) | |
| ) | |
| KODZ, ANTHONY J., LLC d/b/a ) | ADV. NO. 312-90232 |
| CLASSIC HARLEY DAVIDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JOHN VINCE TROTTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

___

## MEMORANDUM OPINION
___

The plaintiff filed this complaint against the debtor to determine the amount and the dischargeability of its debt under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). For the following reasons, which represent the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, the Court finds that the relief requested in the complaint should be granted in part.

# I. THE PLAINTIFF'S STORY

It is undisputed that National Public Auction, National Public Auction, Inc., and National Public Auction, LLC, were never registered with Tennessee's Secretary of State and, therefore, are d/b/a's of John Vincent Trotter, the debtor-owner of the auction facility at 2349 South Church Street, Murfreesboro, Tennessee.[1] Between 2009 and 2011, the debtor conducted auctions under his auctioneer's license but carried no license to auction motor vehicles.

Kevin Kodz (hereinafter "Mr. Kodz"), with his father and sister, own two Harley Davidson dealerships known as Classic Harley Davidson. One dealership is located in Pennsylvania and the other is in New York.

In November 2009, Mr. Kodz was contacted by a woman named Jennifer who was soliciting vehicles to be sold through a public auction in Murfreesboro, Tennessee. Mr. Kodz requested more information, and he received a fax from Jennifer dated November 18, 2009. Included in the fax was a page titled "National Public Auction." Below the title, was a list of items which National Public Auction purportedly sold at auction, with autos, boats, ATVs, and motorcycles at the top. The memo further states:

---

[1] Only National Public Auction Company, LLC, was registered, and the plaintiff never did business with that entity. National Public Auction Company, LLC, was dissolved by the Secretary of State on August 9, 2011.

National Public Auction provides a service for dealers, finance companies, banks, and businesses across the country. We have over 20 years experience and have built a professional reputation as a quality auction facility throughout the southeast. Over the years we have created new markets for dealers by helping them move stale inventory, lowering costs and interests, and by making space for newer inventory to be sold.

* * * *

Thank you for your time. We look forward to hearing from you!

Charlie Watson
Executive Sales

* * * *

The next page of the fax is titled:

National Public Auction Inc.

DIRTBIKE SALES RESULTS

This is followed by a listing of the year, make, model, and sales price of several dirt bikes.

The following three pages are the same with listings of street bike sales.

Mr. Kodz reviewed the information and compared the sales results with bikes Classic Harley Davidson had in stock and had previously sold, and it appeared that the sale prices were as high or higher than the prices that Classic Harley Davidson had previously received for similar bikes. Mr. Kodz then turned the information over to his brother-in-law, Alan Friedlander (hereinafter "Mr. Friedlander"), the sales manager for Classic Harley Davidson. Based on the information, Mr. Friedlander contacted Charlie Watson (hereinafter

"Mr. Watson") at National Public Auction. Mr. Watson assured Mr. Friedlander of the company's experience and success for the past 20 years. Based on this conversation, Mr. Friedlander faxed a list of 22 bikes with reserve prices. Mr. Watson said the reserve numbers were good, that the auction would have no trouble getting those prices, and that the bikes would only be sold if the reserves were met or if Mr. Friedlander otherwise agreed on a lesser auction price. The auction was scheduled for December 5, 2009, and neither Mr. Friedlander nor Mr. Kodz were going to be available on that date. Mr. Watson agreed that he would call Mr. Friedlander before his bikes went on the auction block so that he could be involved in determining the final sale price. In their conversations, Mr. Watson agreed to reduce the commission per sold bike from $350 to $250 and said that no other costs would be charged to Classic Harley Davidson. It was also agreed that if any bikes did not sell, Mr. Friedlander would have 7 to 10 days to pick up the bikes at his expense. Based on these discussions, a review of the faxed materials, and a review of the auction's webpage, Mr. Friedlander and Mr. Kodz decided that National Public Auction was a legitimate and successful business and that Classic Harley Davidson should participate in the auction.

With this oral agreement, National Public Auction picked up the 22 bikes from Classic Harley Davidson in Pennsylvania. Classic Harley Davidson also sent the unsigned titles for the bikes, as requested, so that National Public Auction could determine that Classic Harley Davidson had good title to the bikes. It was understood that the titles would be held pending Classic Harley Davidson's approval of the sales at or above the reserve prices, and at that

4 - U.S. Bankruptcy Court, M.D. Tenn.

time, Mr. Kodz would sign a limited power of attorney document so that National Public Auction could transfer the titles to the buyers.

Two days before the auction, National Public Auction faxed a written contract to Classic Harley Davidson. Mr. Kodz reviewed the contract and had some concerns but believed he could trust Mr. Watson at his word. The contract indicated that the bikes would be "sold on the following terms: absolute see list." Although the term "absolute" normally means sold without reserve, Mr. Kodz believed that the "see list" referred to the list previously provided that set out the reserve prices. Accordingly, when Mr. Kodz signed the contract, he attached a copy of the reserve list and faxed it back. The total reserve on the 22 bikes was $203,500. Mr. Kodz was also concerned that the contract indicated that Classic Harley Davidson would be responsible for costs in addition to the $250 commission, but again, he believed he could take Mr. Watson at his word.

On the day of the auction, Saturday, December 5, 2009, Mr. Friedlander was at the New York dealership for a store event. When Mr. Friedlander did not hear from Mr. Watson as promised, he started trying to call around 10:00 a.m. No one answered the phone, and he continued to call the rest of the day and the next. Mr. Kodz also tried to contact someone at National Public Auction on the date of the auction, but no one answered the telephone. Mr. Friedlander was finally able to reach someone at National Public Auction on Monday, December 7, 2009. A woman named Mary answered the phone and said that all the bikes

5 - U.S. Bankruptcy Court, M.D. Tenn.

Case 3:12-ap-90232    Doc 35    Filed 06/17/13    Entered 06/17/13 15:58:39    Desc Main
Document    Page 5 of 15

had sold but she did not know about the reserves. Mary faxed a "consignor statement" to Mr. Friedlander showing the sale prices on the bikes. The total gross sales were $114,777.77. The $250 per bike commission of $5500 was subtracted from this amount, as was $5738.85 in advertising costs. The list reflected that five of the bikes had not yet been paid for and should have still been in National Public Auction's possession. Realizing that the bikes had been sold for half the reserve amount, Mr. Kodz called Mary back and instructed her not to sign over any of the titles. Mary indicated that she would have to call back, which she never did, and Mr. Kodz was unable to reach anyone at National Public Auction.

At this point, Mr. Kodz contacted an attorney, who faxed a letter to Mary at National Public Auction on December 8, 2009, demanding that National Public Auction immediately stop the transfer of the bikes because none of the reserve prices had been met. The letter further stated that National Public Auction was not authorized to release the titles. No one at National Public Auction responded to the letter. Mr. Kodz and Mr. Friedlander were afraid that Classic Harley Davidson might not receive any funds from the sale, so Mr. Kodz sent an e-mail to Mr. Watson, directing National Public Auction to immediately send whatever proceeds had been obtained. The plaintiff received a check for $103,538.88, dated December 11, 2009.

On December 15, 2009, Classic Harley Davidson filed a warrant to recover personal property in general sessions court. An immediate writ of possession was issued, but no bikes were found on the premises.

On cross-examination, the debtor admitted that while he had a general auctioneer license (the license number on the contract), he did not have a license to auction vehicles or a motor vehicle dealer license, both of which are required by state law, on the date of the auction in question. In fact, on March 3, 2010, the debtor entered into a consent order with the Tennessee Motor Vehicle Commission, whereby he admitted selling motor vehicles at the December 2009 auction without a valid motor vehicle dealer license and paid a $5000 fine.

## II. **THE DEBTOR'S STORY**

Mr. Trotter testified that he started operating National Public Auction in October 2009 and had been in business approximately one month when Mr. Watson contacted Classic Harley Davidson. While the debtor would not have chosen the same words used in Mr. Watson's fax, he did not think it was misleading since the staff had at least 20 years of collective experience in the auction business. Moreover, he did not think it was misleading that the fax provided a list of national sales rather than sales made by National Public Auction, despite the heading "National Public Auction, Inc." at the top of the sales list. He also testified that whether the sales numbers were national averages or sales made by

7 - U.S. Bankruptcy Court, M.D. Tenn.

Case 3:12-ap-90232    Doc 35    Filed 06/17/13    Entered 06/17/13 15:58:39    Desc Main
Document      Page 7 of 15

National Public Auction was "splitting hairs," and that his failure to have the licenses required by the state to sell motor vehicles meant nothing.

The debtor claimed that he never authorized or knew that Mr. Watson made any statements that disagreed with the terms of the contract. In fact, the debtor testified that he was the only one who was authorized to approve reserve prices, and no such request was made of him. When the debtor received the contract, he testified that it was signed by Mr. Kodz so he signed it as well. The debtor testified that he never saw a list of reserves and that he believed the contract provided for an absolute sale, advertising expenses, and a limited power of attorney. Moreover, the debtor testified that Classic Harley Davidson did not have to send the titles until 10 days after the auction.[2]

---

[2] The Court notes that T.C.A. § 62-19-128(f) provides:

The public automobile auctioneer shall take possession of and retain title to each motor vehicle offered for sale at the auction. If the sale is finalized on a motor vehicle, the owner of the vehicle shall sign the title over to the public automobile auctioneer, who shall then sign the title over to and deliver the title to the buyer on the date of the sale. If a sale of the vehicle is not made, then the unsigned title shall be returned to the owner of the vehicle who offered the vehicle for sale at the auction.

### III. DISCUSSION

The debtor filed his Chapter 7 petition on January 24, 2012. The adversary proceeding was filed on April 24, 2012, and the complaint seeks a non-dischargeable judgment in the amount of $94,461.12[3] plus attorney fees and expenses.[4]

#### A. Non-Dischargeability Generally

Generally, exceptions to discharge are to be construed strictly against the creditor. *Gleason v. Thaw*, 236 U.S. 558, 562, (1915). The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

#### B. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) denies discharge of a debt:

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

---

[3]This amount equals the difference between the reserve prices and the amount remitted less the commissions, however, the commissions were already deducted from the amount remitted.

[4]The complaint does not set forth a separate count for attorney fees or provide a basis for awarding such fees. The Code does not provide a statutory basis for awarding attorney fees to a prevailing creditor in a dischargeability action, *Synergeering Group, LLC v. Jonatzke (In re Jonatzke),* 478 B.R. 846, 869 (Bankr. E.D. Mich. 2012) (citations omitted), therefore, fees are only awarded where an independent basis exists. *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1168 (6th Cir. 1985). *See also Lawson v. Conley (In re Conley),* 482 B.R. 191, 208 (Bankr. S.D. Ohio 2012) (Fed. R. Bankr. P. 7008(b) requires attorney fees be pled as separate count).

9 - U.S. Bankruptcy Court, M.D. Tenn.

Case 3:12-ap-90232    Doc 35    Filed 06/17/13    Entered 06/17/13 15:58:39    Desc Main
Document      Page 9 of 15

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The Sixth Circuit has held that in order to except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
>
> (2) the debtor intended to deceive the creditor;
>
> (3) the creditor justifiably relied on the false representation; and
>
> (4) its reliance was the proximate cause of loss.

***Rembert v. AT & T Universal Card Services, Inc. (In re Rembert),*** 141 F.3d 277, 280-281 (6th Cir. 1998) (citation omitted).

### 1. <u>Vicarious Liability</u>

In the present case, the misrepresentations were made by the debtor's sales representative, Mr. Watson, and the first question is whether the debtor can be held accountable for Mr. Watson's statements if those statements otherwise meet the requirements of 11 U.S.C. § 523(a)(2)(A).

Issues of agency liability under 11 U.S.C. § 523(a)(2)(A) are influenced by state law. W. Brian Memory, ***Vicarious NonDischargeability for Fraudulent Debts: Understanding the Dual Purposes of § 523(a)(2)(A)***, 20 Emory Bankr. Dev. J. 633, 666 (Spring 2004) (best

practice is deference to nonbankrutpcy law to determine imputed liability); *Aviva Life Ins. Co. v. Burton (In re Burton),* Adv. No. 08-5065, 2009 WL 537163, *4 (Bankr. E.D. Tenn. Feb. 20, 2009) ("not essential for a fraud dischargeability action that the debtor personally made misrepresentations, as long as the debtor is liable for the misrepresentations and resulting fraud under state law"). *See BancBoston Mortg. Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1561-62 (6th Cir. 1992) (citing Tennessee law).

In Tennessee, a principal "will be liable for false and fraudulent representations of his agent in effecting a sale of lands and goods." *J.B. Colt Co. v. Odle,* 4 Tenn. App. 174, 1926 WL 2112, *3 (1926) (citation omitted). Further, "[a] principal who accepts the benefit of a contract made on his behalf by his authorized agent, will be held responsible for the fraudulent misrepresentations of the agent, although made without his authority." *Id.* (citations omitted). *See also Medlin v. Clyde Sparks Wrecker Serv., Inc.*, 59 F. App'x 770, 775 n. 4 (6th Cir. 2003) (citations omitted) ("[u]nder Tennessee law, punitive damages may be awarded against a principal whose liability arises from the acts of an agent"); *Dodson v. Anderson,* 710 S.W.2d 510, 513 (Tenn. 1986) (citations omitted) (same).

The Court finds that under Tennessee's agency law, the debtor is personally liable for any fraudulent misrepresentations made by his sales representative, whom he employed

to contact potential customers and solicit vehicles to be auctioned through the debtor's business.

## 2. The Elements of 11 U.S.C. § 523(a)(2)(A)

Mr. Watson's statements and representations to the plaintiff more than meet the requirements of 11 U.S.C. § 523(a)(2)(A).

First, the statements made and materials provided by Mr. Watson were clearly intentional misrepresentations as shown by the proof. These intentional misrepresentations started early: Mr. Watson's materials claimed that National Public Auction had been in business more than 20 years and that "over the years" the business had created new markets – representations which he had to know were false since the business had only been in operation for a month. Also, attached to his fax was a list of prior bike sales under the heading National Public Auction, which to any reasonable person appears to be a list of prior sales by the company instead of national sales. Mr. Watson also misrepresented the terms of the sale. He assured Mr. Friedlander that the reserve prices would be honored, that the only charge would be a $250 commission per bike sold, and that he would contact Mr. Friedlander on the day of the auction so that he could participate, none of which was true. That these misrepresentations were intentional and designed to persuade the plaintiff into sending bikes for the auction is supported by the lack of veracity in any of the

communications with Mr. Watson, by his disappearance on the day of the auction, and by Mr. Trotter's own testimony that only he could approve reserve sales.[5]

As the trier of fact, the Court had the opportunity to view the witnesses on the stand and assess their demeanor. The testimony of Mr. Friedlander and Mr. Kodz regarding Mr. Watson's representations made to them was very credible, and their testimony was uncontradicted. Accordingly, the Court finds that the debtor, through his agent, made knowingly false statements to induce Classic Harley Davidson to send bikes to be sold at the debtor's illegal vehicle auction.

The Court further finds that Classic Harley Davidson reasonably relied on these misrepresentations with regard to the reserve prices and that their reliance caused their substantial losses. Mr. Friedlander and Mr. Kodz testified that they had significant experience with auctions all over the country and that it was customary to place a reserve on bikes sent to auction. Both testified that they had never sent bikes to auction without a reserve price and that Mr. Watson assured them that the reserves were not a problem. In addition, the contract stated that the bikes would be sold "absolute see list." Mr. Kodz credibly testified that "absolute see list" was handwritten into the contract when he received

---

[5]It should also be noted that Mr. Trotter's demeanor on the stand was highly questionable. Because of this demeanor, together with his flippant attitude regarding licencing requirements, the Court has serious doubts about whether his statement denying knowledge of the reserve sheet with the signed contract was true.

13 - U.S. Bankruptcy Court, M.D. Tenn.

it. He understood the "see list" as referring to the list with reserve prices that he had previously sent to Mr. Watson. Consequently, he signed the contract and attached the list with the reserve prices. Accordingly, the Court finds that Classic Harley Davidson reasonably relied on the misrepresentation that the bikes would not be sold below the reserve prices listed and that Mr. Friedlander would be able to participate in the auction by telephone. The result is that the debtor sold the bikes for $88,722.27 below the reserves.

The same cannot be said with regard to the sales expenses. Given his other misrepresentations, the Court believes that Mr. Watson represented to Mr. Friedlander that Classic Harley Davidson would not be charged any other expenses besides the $250 commission per unit sold. However, Mr. Kodz signed the contract, albeit with reservations, which provided for the payment of sales related expenses. This language in the contract was clear, and regardless of representations made by Mr. Watson, Mr. Kodz should have taken steps to clarify or change the terms before signing the contract.

Accordingly, the Court finds that Classic Harley Davidson is entitled to a judgment of $88,722.27, based on the following calculation: $203,500 (total reserve prices) - $5,500 (total commissions) - $5,738.85 (sale expenses) = $192,261.15 (total amount owed) - $103,538.88 (amount remitted) = $88,722.27. The Court further finds that this judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### C. 11 U.S.C. § 523(a)(4)

Classic Harley Davidson also asserts that its debt is non-dischargeable under 11 U.S.C. § 523(a)(4). Because of the lack of relevant argument and proof on this issue and because the Court has already found that the debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), the Court declines to address the non-dischargeability under 11 U.S.C. § 523(a)(4).

### III. CONCLUSION

Accordingly, the Court finds that Classic Harley Davidson is entitled to a non-dischargeable judgment in the amount of $88,722.27 pursuant to 11 U.S.C. § 523(a)(2)(A).

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**